IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL H. SIMPSON,

                 Plaintiff,

      v.

BEAVER DAM COMMUNITY HOSPITALS, INC,

                Defendant.

OPINION AND ORDER

13-cv-40-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil rights action brought pursuant to Title VII of the Civil Rights Act and 42 U.S.C. § 1981, plaintiff Michael Simpson alleges that defendant Beaver Dam Community Hospitals, Inc. did not approve his application for medical staff privileges because of his race. The case is before the court on defendant's motion for summary judgment. Dkt. #18. Defendant contends that plaintiff cannot prove discrimination under either the direct or indirect method of proof applicable to employment discrimination claims for three reasons: (1) plaintiff did not suffer a materially adverse employment action because he withdrew his application for employment before a defendant made a decision about staff privileges; (2) plaintiff has not shown that similarly situated individuals of a different race were treated better than he was; and (3) defendant had legitimate, non-discriminatory reasons for not approving plaintiff's application for medical staff privileges that plaintiff has failed to refute.

Defendant's motion will be granted. No reasonable jury could conclude that defendant failed to grant plaintiff medical staff privileges because of his race; rather, the

uncontradicted evidence shows that defendant was not going to move forward with plaintiff's application for medical privileges because of legitimate concerns about plaintiff's past performance, judgment and behavior.

From the parties' proposed findings of fact, I find for the purpose of deciding defendant's motion that the following facts are undisputed.

## UNDISPUTED FACTS

### A.  The Parties

Plaintiff Dr. Michael H. Simpson is a physician practicing medicine at Franciscan Physician Network in Chicago, Illinois.  Previously, he worked as a physician and medical director at Community Health Systems in Beloit, Wisconsin.

Defendant Beaver Dam Community Hospitals, Inc. is a not-for-profit organization of integrated healthcare services licensed to do business in the state of Wisconsin, with its principal place of business in Beaver Dam, Wisconsin.

### B.  Application for and Offer of Employment

On February 23, 2010, Shauna Smith, a recruiter at the Merritt Hawkins firm, emailed Mark Monson, defendant's chief operations officer, about plaintiff's interest in working as a family practice physician at a clinic in or around Columbus, Wisconsin.  Smith attached to her email a professional reference given by Dr. AJ Pampalone, a colleague of plaintiff for two years, indicating that plaintiff was "professional and well liked by patients

2

and co-workers." She also sent plaintiff's answers to a "Candidate Questionnaire," in which plaintiff had answered "yes" to the question "Have you ever been subject to any claims for medical liability litigation or are any pending?  If so, include the details of each claim on a separate page."  Plaintiff provided a separate handwritten statement indicating he was "named as

defendant in wrongful death suit of 20-month old child.  My only contact with the deceased was first two days of life.  Case is pending."  Plaintiff also stated that he was "named as defendant in wrongful death suit of patient who died of pneumonia.  Case is pending." Monson typically discloses an email like the one he received from Smith to Kimberly Miller, defendant's chief executive officer.

On February 26, 2010, Monson conducted a phone interview with plaintiff.  Around that time, he also arranged for plaintiff to visit defendant's facilities and interview in person for a family practice physician position.  On March 16, 2010, plaintiff visited the facilities and was interviewed by Monson, Kimberly Miller and other hospital staff.  None of the evaluators identified any concerns about plaintiff's candidacy after meeting with him.

Defendant's executive team, which consists of Monson, Kimberly Miller, Scott Abrams (chief financial officer), Amy Nyberg (chief strategy officer) and Bridget Sheridan, discussed whether to offer employment to plaintiff.  It was Monson's role to gather consensus from the team and make a hiring recommendation to Miller, who then offered plaintiff the position.  (The parties dispute whether it was the team or Kimberly Miller who

3

made the final decision to hire plaintiff but the dispute is immaterial to the motion for summary judgment.)  Kimberly Miller knew plaintiff's race when she offered him the job.

Monson sent plaintiff a physician employment agreement, which set forth the terms and conditions of the family physician position.  The agreement stated in part that plaintiff must apply for, obtain and maintain active medical staff membership and clinical privileges.  It further provided that "Hospital agrees to pay Physician a signing bonus in the amount of Twenty Thousand Dollars ($20,000).  Hospital shall pay Physician the signing bonus within five (5) days after first day of employment."  Therefore, in order to receive the bonus, plaintiff had to satisfy certain conditions and defendant had to grant plaintiff medical staff privileges.  After plaintiff accepted this offer, defendant paid the recruiter $12,000.

## C.  Defendant's Credentials Committee

According to defendant's medical staff bylaws, the credentials committee and then the medical executive committee each make a separate recommendation to the board of directors regarding the granting or denying of medical staff privileges for physicians.  The medical executive committee reviews the recommendation of the credentials committee and makes its own recommendation to the board of directors.  The board of directors then makes a decision regarding the granting or denying of medical staff privileges.

At the time of plaintiff's application, the credentials committee was made up of six physicians who each had an equal vote.  In addition, Kimberly Miller and Dr. Eric Miller, medical staff chief of staff, served as non-voting members of the committee.  It takes a

4

majority of the voting members of the committee to recommend medical staff privileges. Dr. Joel Miller served as the chairman of the committee and voted in the event of a tie. (Dr. Joel Miller, Dr. Eric Miller and Kimberly Miller are not related to each other.) Lisa Wendlandt, executive assistant to the medical staff, would attended committee meetings to provide administrative support.

Defendant's bylaws set forth the following written criteria for medical staff privileges:

Applications for appointment to the Medical Staff will only be accepted from physicians, podiatrists and dentists: who (1) have unrestricted legal licenses to practice their respective profession in the State of Wisconsin which permits them to practice independently in the Hospital setting and authorizes them to receive and examine patients, diagnose conditions, prescribe and implement a treatment plan and to prescribe all medications necessary for the treatment of conditions and diagnoses within their area of practice, independent of review, supervision or prescription by another practitioner; (2) have offices and residences located in sufficient proximity to the Hospital to be able to provide quality care to their patients at the Hospital; (3) can document their (I) background, experience, training, good judgment, and current competence, as demonstrated by peer data, references and otherwise, (ii) adhere to the ethics of their profession, (iii) have good reputation and character, including mental and emotional stability and physical health status, according to the law, and (iv) have the ability to work harmoniously with others so that the Hospital is sure that all patients treated by them at the Hospital will receive quality care and that the Hospital and its Medical and Allied Staffs will be able to operate in an orderly manner; and (4) maintain at least the minimum professional liability insurance coverage set forth by the Hospital. All applicants for membership to the Medical Staff ("Prospective Member") have the burden of adequately documenting and demonstrating that their credentials meet the standards necessary to assure the Medical Staff and the Board that patients treated by them in the Hospital will be given a high quality of medical care. No Prospective Member is entitled to appointment to the Medical Staff or to the exercise of particular clinical privileges in the Hospital solely by virtue of the fact that he/she is duly licensed to practice medicine, osteopathy, podiatry or dentistry in Wisconsin, or any other state, or that he/she meets any written minimum criteria which may from time to time be adopted by the Board, or that he/she maintains a certification, fellow status or is a member of any professional organization specialty body or

society, or that he/she had in the past or presently has, such privileges at another healthcare entity. The Hospital does not and will not discriminate on the basis of sex, race, creed, national origin, disability, ancestry, sexual orientation or any other status protected by law.

D.   Plaintiff's Application for Medical Staff Privileges

On April 25, 2010, plaintiff submitted an "Application for Appointment of Medical Staff" to defendant's credentials committee, in which he indicated that he had earned his medical degree from the American University-Caribbean in October 1999; completed his medical internship and residency at Detroit Medical Center-Sinai Grace Hospital in June 2002 and August 2004, respectively; maintained active medical privileges at the Shifa Clinic in Valparaiso, Indiana and Provena St. Mary's Hospital and the Riverside Medical Center in Kankakee, Illinois; and was certified by the American Board of Family Physicians in July 2006.  He also answered "yes" to the following questions:

- "Has any of the following ever been, or are any currently in the process of being denied, revoked, suspended, reduced, limited, placed on probation, not renewed, or voluntarily relinquished . . . Any other type of profession sanctions?"

- "Have any judgments or settlements been made against you in professional liability cases or are any such cases pending?"

On May 6, 2010, Kimberly Miller sent an email to Monson indicating she had questions about plaintiff's materials.  She wrote that if applicants "are not upfront with us about all outstanding items then we need to have a clause to exit the discussions without any issue if we decide to . . . at the point that we discover something.  I just have some concerns."  Kimberly Miller met plaintiff only twice: once during the interview process and again in September 2010.

6

On July 29, 2010, Wendlandt emailed plaintiff requesting information about his "yes" response to the question about "any other type of profession sanctions."  On July 30, 2010, plaintiff replied by email that he "was placed on academic probation during intern year due to poor evaluation by senior resident and poor performance on in-training exam." On August 3, 2010, plaintiff informed Wendlandt that he was scheduled to sit for an oral examination on August 18, 2013, before the Wisconsin Department of Regulations and Licensing as a condition of receiving his license.  (Plaintiff took the exam, which consisted of four to five questions regarding his employment.)

On August 5, 2010, Wendlandt emailed plaintiff and requested information regarding the medical malpractice claims previously disclosed by plaintiff in which he was named as a defendant.  That same day, plaintiff responded by email that the two medical malpractice claims were filed at a point when he had no liability insurance.

On August 17, 2010, Dr. Joel Miller sent plaintiff a letter indicating that his application for medical staff privileges was missing some information.  He asked plaintiff to provide information regarding the two pending medical malpractice claims, his placement on academic probation and copies of any correspondence from the Wisconsin Examining Board explaining the need to pass an oral examination in order to obtain his license to practice medicine.  (According to Joel Miller, this was the first time the credentials committee had considered a candidate who, as a previously-licensed physician in other states, was required by the Wisconsin Medical Examining Board to participate in an oral exam prior to a decision on licensure.  Dkt. #23 at ¶ 8.)  Dr. Joel Miller stressed the

importance of supplying the information quickly because plaintiff had "agreed to commence employment, and thus practice at the hospital, on September 1, 2010, subject to appointment." He sent copies of the letter to Kimberly Miller, Dr. Eric Miller and Mark Monson.

On August 20, 2010, plaintiff emailed Wendlandt, providing information in response to Dr. Joel Miller's questions. On September 7, 2010, plaintiff's residency program confirmed with defendant that plaintiff had remediated his deficiencies successfully and that his performance remained at an acceptable or above average level for the remainder of his residency. Plaintiff's attorney also sent defendant two letters questioning the legitimacy of the medical malpractice claims against plaintiff.

On August 26, 2010, plaintiff submitted an "Application for Employment," in which he asked defendant to refrain from requesting a reference from his former supervisor, Dr. Abdus Lakhani, who had previously recommended plaintiff without reservation on June 16, 2010. (Although plaintiff says this was a second application for medical staff privileges, the form indicates that it is actually an application for employment and differs from the form plaintiff completed in April 2010.) However, after that recommendation, plaintiff had a personal "falling out" with Dr. Lakhani.

On September 22, 2010, plaintiff emailed Monson regarding the information he supplied to the credentials committee and requested that a check for his signing bonus be made available pending the approval of his application for medical privileges. Plaintiff also explained that he would be available at the meeting of the credentials committee "in case any

other documentation is needed or questions remain." On September 22, 2010, Monson replied to plaintiff's email stating, "I will have a check prepared and leave it with my Asst. Darlene Minnema."

At 10:24a.m. on September 24, 2010, Wendlandt sent Kimberly Miller an email with the subject line of "QUESTIONS POSED BY CREDENTIALS," in which she indicated that the committee wanted more information on why plaintiff was required to take an oral medical licensing examination, what happened with his initial medical school in Illinois and the gaps between his residency and medical school and residency and board certification. At 11:19 a.m. on the same day, Kimberly Miller sent an email to Monson, labeled "high importance." The subject line of the email was "Credentialing for Dr. Simpson" and the text of her message stated, "Was delayed, they have asked for much more information and the conversation was tense."

At approximately 12:30p.m. on September 24, 2010, plaintiff arrived at defendant's offices and spoke with Darlene Minnema about the check for his signing bonus. Plaintiff expressed frustration when he learned that the check was not available and then spoke with Kimberly Miller about why he had not received it. (The parties dispute whether plaintiff became angry and aggressive during this exchange.)

E.   Denial of Plaintiff's Application

On September 24, 2010, the credentials committee met to review the status of plaintiff's medical staff privileges application.  The following entry appears in the committee minutes:

> Members reviewed the profile for Dr. Michael Simpson. Members expressed various concerns including: the number of places practiced in the past six years, state licensing board requiring oral test, malpractice cases, and the gaps in employment.
>
> Members would like the following questions answered:
>
> Letter to Licensing Board: Ask the Wisconsin medical licensing board why Dr. Simpson was required to take orals.
>
> Letter to Dr. Simpson: Explain all gaps including residency and medical school, residency and board certification, and any other gaps.
>
> What happened with initial medical school in Illinois?
>
> Members asked questions regarding the interview and employment process.

The committee tabled plaintiff's application for medical staff privileges and deferred action to its next meeting on October 13, 2010.  After the September 24, 2010 meeting and before the October 13, 2010 meeting, Dr. Joel Miller requested additional information from plaintiff and the State of Wisconsin Division of Licensing and Regulation on plaintiff's need to take an oral exam in order to be licensed to practice medicine in Wisconsin, the gaps in his employment and education history, his employment termination from Provena Services Corporation and his board certification experiences.

On September 28, 2010, plaintiff sent an email to Dr. Joel Miller regarding his failure to secure medical privileges with defendant, explaining that he answered four to five questions posed by the Wisconsin Department of Regulation and Licensing regarding his

10

application for a medical license and that the exam was over in approximately three minutes. In an email to Wendlandt dated September 29, 2014, plaintiff responded to Dr. Joel Miller's questions about "gaps" in his training, education and work history, and his need to take his boards twice.

Dr. Joel Miller also received feedback from one of plaintiff's former employers regarding his demeanor, which was consistent with what had been reported to him about plaintiff's behavior when plaintiff asked for his signing bonus check on September 24, 2010. (Although plaintiff asserts that the bad reference came from Dr. Lakhani, he has provided no evidence establishing this fact. Further, Dr. Miller avers that he spoke with a female staff member from another one of plaintiff's former employers.) Dr. Joel Miller also was concerned that plaintiff had been placed on probation during his residency.

On October 12, 2010, after discussing plaintiff's application with Kimberly Miller and Dr. Joel Miller, Dr. Eric Miller called plaintiff with Wendlandt present. During the 45-minute telephone call, Dr. Eric Miller explained to plaintiff that if defendant denied his application, it would have to report the denial to the National Practitioner Data Bank. Dr. Eric Miller outlined some of the concerns, which included plaintiff's employment and education history, the need to take an oral exam from the State of Wisconsin, the malpractice lawsuits and plaintiff's interpersonal communications. At this point, the credentials committee had not yet made an official recommendation on plaintiff's application.

After this conversation, plaintiff withdrew his application of employment with defendant because he did not want to risk a denial of medical privileges being reported to the National Practitioner Data Bank.  On October 13, 2010, the credentials committee met and closed plaintiff's file without taking action on his credentials application.   Had defendant denied plaintiff's medical staff privileges application, it would have been a negative for plaintiff in obtaining his job at Franciscan Physician Network.

### F.   Dr. Eric Miller's Statements

Plaintiff alleges that during the October 12, 2010 telephone conversation, Dr. Eric Miller stated the following:

- Plaintiff's application contained several "red flags."

- Plaintiff engaged in "disruptive behavior" during his conversation with Kimberly Miller about his signing bonus.

- Miller would have expected someone seeking employment to be on their "best behavior" and more "collegial."

- They had had "bad actors" in the past and found it easier to not hire a bad actor than to try and get rid of a bad actor.

- "I wish you well on finding a position where you are a better fit."

Plt.'s Decl., dkt. #29, exh. 6; Plt.'s Depo., dkt. #15 at 90-91.  Although defendant disputes the content of the statements, it assumes plaintiff's version of the conversation in arguing its motion for summary judgment.

### G.   Subsequently Hired Physicians

On August 15, 2010, defendant hired Dr. Michael Schreiber and on September 13, 2010, it hired Dr. Natalie Sieb, both of whom are Caucasian.  After October 12, 2010, defendant hired Dr. James Flood, a Caucasian man, as a family practice physician at its clinic in Columbus, Wisconsin.  (Plaintiff has not provided any foundation for his additional proposed fact that defendant approved these physicians' applications for medical privileges.)

OPINION

Plaintiff contends that defendant discriminated against him because of his race in violation of Title VII and § 1981 when it failed to approve his application for medical staff privileges.  He may prove discrimination under these statutes either directly by presenting direct or circumstantial evidence of discrimination, or indirectly using the burden-shifting approach in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Coleman v. Donahoe, 667 F.3d 835, 845 (7th Cir. 2012); Silverman v. Board of Education of the City of Chicago, 637 F.3d 729, 733 (7th Cir. 2011).  See also Friedel v. City of Madison, 832 F.2d 965, 971 (7th Cir. 1987) ("When the plaintiff alleges intentional discrimination, as here, it is clear that the same standards in general govern liability under section 1981, 1983 and Title VII.").  Plaintiff argues discrimination under both methods.

Under the direct method, plaintiff must provide either direct or circumstantial evidence that supports an inference of intentional discrimination.  Direct evidence requires an admission of discriminatory intent, which is not present in this case.  Alexander v. Casino Queen, Inc., 739 F.3d 972, 979 (7th Cir. 2014).  However, plaintiff can prevail under this

13

method "by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'"   Rhodes v. Illinois Dept. of Transportation, 359 F.3d 498, 504 (7th Cir. 2004) (citation omitted).  Such circumstantial evidence typically includes:  (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action.  Darchak v. City of Chicago Board of Education, 580 F.3d 622, 631 (7th Cir. 2009) (citing Sun v. Bd. of Trustees, 473 F.3d 799, 812 (7th Cir. 2007); Troupe v. May Department Stores, Inc., 20 F.3d 734, 736 (7th Cir. 1994)).  The evidence "must point directly to a discriminatory reason for the employer's action."  Adams v. Wal–Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003).

The indirect method involves similar and often overlapping considerations.  In a failure to hire case, which I find most analogous to plaintiff's situation in this case, plaintiff must first establish a prima facie case of discrimination with evidence that (1) he is a member of a protected class; (2) he applied for and was qualified for an open position; (3) he was rejected (or suffered some form of an adverse employment action); and (4) defendant filled the position with a person not in the protected class or left the position open.  Rudin v. Lincoln Land Community College, 420 F.3d 712, 724 (7th Cir. 2005) (citing Mills v. health Care Service Corp., 171 F.3d 450, 454(7th Cir. 1999)); Bennett v. Roberts, 295 F.3d 687, 694 (7th Cir. 2002).  Once a prima facie case is established, a presumption of

discrimination is triggered and the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action. Id.  When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. Id.; McDonnell Douglas, 411 U.S. at 804.

The Court of Appeals for the Seventh Circuit has expressed frustration with the "confusing 'snarls and knots' of this ossified direct/indirect paradigm," Hitchcock v. Angel Corps, Inc., 718 F.3d 733, 737 (7th Cir. 2013), and in some cases has adopted a simpler analysis that asks whether a reasonable jury could infer prohibited discrimination, e.g., Perez v. Thorntons, Inc., 731 F.3d 699, 703 (7th Cir. 2013), but the court continues to analyze discrimination claims under both methods on occasion, e.g., Alexander v. Casino Queen, Inc., 739 F.3d 972, 979 (7th Cir. 2014).  The parties have chosen to analyze plaintiff's claims under both methods, but plaintiff cites the same evidence to show circumstantial evidence of intentional discrimination under the direct method and pretext under the indirect method:  (1) defendant unreasonably believed that he was not qualified for the position; (2) defendant subsequently hired three white physicians; and (3) at the time Dr. Eric Miller told him the committee would not approve him for medical privileges, he made racist comments to plaintiff.  Because the analysis is the same under the direct method and the pretext prong of the indirect method under the facts in this case, it makes sense to consider these arguments together.  Atanus v. Perry, 520 F.3d 662, 672 (7th Cir. 2008) (pretext can be evidence of discrimination under direct method).

15

With respect to the indirect method, defendant did make a number of arguments about why plaintiff cannot establish a prima facie case of discrimination, such as that plaintiff did not suffer an adverse employment action because he withdrew his application for employment before defendant reached a decision on his application.  Nevertheless, I need not address all of the parties' arguments on this issue because defendant has offered legitimate, nondiscriminatory reasons for taking each of the adverse employment actions at issue.  Hitchcock, 718 F.3d at 737. ("It makes sense to first analyze whether there is evidence that [defendant's] proffered non-discriminatory reasons for firing [plaintiff] were pretextual."); Scruggs v. Garst Seed Co., 587 F.3d 832, 838 (7th Cir. 2009) (court "can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action").  "[I]f there is no evidence of pretext, then [defendant's] non-discriminatory justifications for [not approving plaintiff's privileges] must be believed, which necessarily precludes liability under Title VII."  Hitchcock, 718 F.3d at 738.


A.  Defendant's Concerns with Plaintiff's Application

Defendant has alleged that it had a number of concerns with plaintiff's application for medical staff privileges, including (1) plaintiff's need to take an oral exam to obtain a medical license; (2) a negative reference describing plaintiff's disruptive behavior; (3) two uninsured medical malpractice claims; and (4) plaintiff being placed on probation during his residency.  It points out that its written evaluation criteria requires applicants to meet certain standards related to licensing, certification, background, experience, training, good

16

reputation, character, ability to work with others and maintaining liability coverage. Plaintiff does not dispute the criteria but argues that defendant's concerns were baseless and not reasonable under the circumstances in this case.

1. <u>Oral exam</u>

Defendant contends that the credentials committee was concerned about plaintiff's having to take an oral exam in order to obtain his Wisconsin medical license because no other candidate had ever had to do this.  Plaintiff argues that defendant's bylaws required only that he have an unrestricted license, which he obtained on August 19, 2010, well before Eric Miller informed plaintiff that defendant would not be approving plaintiff's application for privileges.  Plaintiff also explained to defendant that the medical examining board only asked him four or five questions regarding his background and employment.

Although plaintiff makes a good point that he technically satisfied defendant's criteria, he has not shown that it was unreasonable for defendant to question why the state medical examining board chose to deviate from the norm and require plaintiff to take an oral exam.   The evaluation criteria in defendant's bylaws provide a number of bases for questioning the unusual procedure used by the examining board.  "[N]othing in Title VII bans outright the use of subjective evaluation criteria."  <u>Millbrook v. IBP, Inc.</u>, 280 F.3d 1169, 1176 (7th Cir. 2002) (quoting <u>Sattar v. Motorola, Inc.</u>, 138 F.3d 1164, 1170 (7th Cir.1998)).  "In fact, 'subjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly

17

service-oriented economy.'" Id. (quoting Denney v. City of Albany, 247 F.3d 1172, 1186 (11th Cir. 2001)).

Although plaintiff may believe that defendant should not have had any concerns about the oral exam once he obtained his license, this does not mean that defendant did not have a genuine concern. Blise v. Antaramian, 409 F.3d 861, 867-68 (7th Cir. 2005) (even though employee may not be qualified, if employer "genuinely believed differently, . . . it is entitled to act on that belief"); Hartley v. Wisconsin Bell, Inc., 124 F.3d 887, 890 (7th Cir. 1997) ("Plaintiffs lose if the company honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless."). Without more, a reasonable jury could not conclude that defendant lied about its concern over plaintiff's need to take an oral exam.

2. Negative reference

It is undisputed that defendant received a negative reference from a staff member at one of plaintiff's former employers. Plaintiff claims that "[d]espite verifying that Plaintiff could work harmoniously with others from three former colleagues and a thorough background check, Defendant went fishing for something negative to sink Plaintiff's candidacy." Dkt. #27 at 25. However, plaintiff's only support for this assertion is that defendant ignored his request that the credentials committee not speak with his former colleague, Dr. Lakhani, who plaintiff assumes purposefully provided a negative reference because plaintiff and Lakhani had a personal falling out. Defendant notes correctly that

18

plaintiff has adduced no evidence that defendant ever spoke with Lakhani.  In fact, Dr. Joel Miller avers that he did not speak with Lakhani or anyone from his office.  In any event, plaintiff has not shown that defendant routinely adheres to applicants' requests not to contact former employers.  Therefore, there is no evidence that defendant treated plaintiff differently than any other candidate with respect to reference checks.

Because plaintiff bases his argument on nothing more than speculation and incorrect assumptions, he has failed to show discrimination or pretext.  It was reasonable for defendant to rely on the fact that it had received a negative reference for plaintiff even though plaintiff previously had provided three positive references.  Typically when one is applying for employment, he chooses to list references from those people whom he knows will provide positive feedback.  The fact that defendant found an employer who was dissatisfied with plaintiff's behavior is not evidence of a discriminatory motive.

3.  Medical malpractice and probation

Plaintiff argues that the medical malpractice and probation reasons are pretextual because defendant knew about the medical malpractice claims and probation before offering him employment and starting the credentialing process.  However, defendant acquired more information during the credentialing process that it says led to its concerns.  Specifically, in response to defendant's further questioning, plaintiff disclosed that he was uninsured at the time the medical malpractice claims were filed and that he was placed on probation for poor performance and a poor evaluation.  Although plaintiff's residency program later told

19

defendant that plaintiff "had remediated his deficiencies" and performed at an acceptable level for the remainder of his residency, this does not mean that defendant was not entitled to express concern about the initial violation. As with defendant's other reasons for not approving his application, plaintiff has failed to meet his burden in showing that the committee's concerns were untrue or unreasonable.

### B. Similarly Situated Caucasian Physicians

Plaintiff has adduced evidence that defendant hired two white physicians in August and September 2010 and another white physician in October 2010, after plaintiff had withdrawn his employment application. He contends that he needs to show only that defendant replaced him, or sought a replacement for him, with someone outside the protected class. However, the Court of Appeals for the Seventh Circuit has made clear that to show pretext under the indirect method (or discrimination under the direct method), there must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the . . . comparison." Coleman, 667 F.3d at 841, 853 (noting Supreme Court and many federal circuit courts have held plaintiff may employ comparator evidence to meet burden at pretext stage). See also Grayson v. O'Neill, 308 F.3d 808, 819 (7th Cir. 2002) (to meet burden, plaintiff must demonstrate that individual is directly comparable in all material respects).

Plaintiff generally argues that there are enough "common features" between him and these physicians to support an inference of discrimination. As defendant points out,

however, plaintiff has not shown that any of these physicians were similarly situated to him. For example, there is no evidence that any of these physicians had any problems similar to those that plaintiff had in terms of his medical malpractice claims, academic probation, negative employment reference or gaps in his employment and educational history.  Without more, there is no basis on which the jury could infer that defendant's reasons for not approving plaintiff's application were discriminatory.

Because plaintiff has not adduced sufficient evidence about the white physicians hired by defendant, it is not possible to draw a meaningful comparison between his treatment and that of the white physicians.  Snipes v. Illinois Department of Corrections, 291 F.3d 460, 463 (7th Cir. 2002).  A variety of factors could account for any disparity in treatment, and a reasonable jury could not infer that discrimination occurred merely from the fact that defendant hired three white physicians.  Id.

## C.  Eric Miller's Statements

Plaintiff contends that a jury could infer a discriminatory motive from Dr. Eric Miller's comments about plaintiff is being a "bad actor" who was not on his "best behavior" and who hopefully would find a "better fit" elsewhere.  He points out that discriminatory comments made by individuals involved in the decision making process around the time of and in reference to the adverse employment action may provide evidence that the decision had an impermissible discriminatory motivation.  Perez v. Thorntons, Inc., 731 F.3d 699, 710 (7th Cir. 2013); Hunt v. City of Markham, Illinois, 219 F.3d 649, 652 (7th Cir. 2000).

21

Although this is true, none of the comments allegedly made by Dr. Eric Miller were discriminatory; they did not address African Americans or discuss racial stereotypes. Mlynczak v. Bodman, 442 F.3d 1050, 1058 (7th Cir. 2006) (refusing to infer discrimination where remark did not refer to plaintiff's race or gender); Markel v. Board of Regents of University of Wisconsin System, 276 F.3d 906, 910 (7th Cir. 2002) (statements must show discriminatory animus).

Plaintiff expressed the opinion at his deposition that "[w]hen you consider the historical inequality of African-Americans, when you consider the times through our history where we were referred to as boy, or gal, and I hear the term 'best behavior,' that is a term that is often times relegated to talking to a child." Dkt. #15 at 92-93. Similarly, plaintiff stated that Miller's comment about a "better fit" was discriminatory because "[w]hen you say 'a better fit,' you are saying somewhere more befitting someone like you. Somewhere you fit in." Id. at 94. According to plaintiff, "[i]t begs the question . . . where would someone like me fit in, being that I am the supposed bad actor that I am?" Id. at 95.

Although plaintiff may have perceived Dr. Miller's comments to be race-related and discriminatory, this does not make them so. Mills v. First Federal Savings & Loan Association of Belvidere, 83 F.3d 833, 841 (7th Cir. 1996). As defendant points out, the Court of Appeals for the Seventh Circuit has held that the "subjective beliefs of the plaintiff . . . are insufficient to create a genuine issue of material fact." Id. (citing McMillian v. Svetanoff, 878 F.2d 186, 190 (7th Cir. 1989)). See also Mlynczak, 442 F.3d at 1058 (plaintiff's belief that employer was "implicitly complaining" about affirmative action policy

22

was too conjectural to serve as evidence of race or gender discrimination).  "Indeed, if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed."  Mills, 83 F.3d at 841-42.

Without other evidence to the contrary, the only reasonable interpretation of Eric Miller's comments is that he considered plaintiff's behavior disruptive and not typical of a person hoping to be offered employment.  His parting wish that plaintiff find a position that was a better fit is commonly used by employers who are rejecting applicants for legitimate reasons.  Miller did not in any way indicate that plaintiff should find a better fit for someone of his race.   Accordingly, I do not find that Dr. Eric Miller's remarks evidence a discriminatory motive on the part of defendant.

Because no reasonable jury could conclude that defendant failed to grant plaintiff medical staff privileges because of his race, I am granting defendant's motion for summary judgment.

ORDER

IT IS ORDERED that defendant Beaver Dam Community Hospitals, Inc.'s motion for summary judgment, dkt. #18, is GRANTED.  The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 9th day of May, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

24